# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| INTERLACHEN PROPERTIES, LLC, KUEPERS CONSTRUCTION, INC., and INTERLACHEN PROPERTYOWNERS ASSOCIATION, INC., | Civil No. 14-4380 (JRT/LIB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| STATE AUTO INSURANCE COMPANY, | |
| Defendant. | |

Lauris A. Heyerdahl, **LARKIN HOFFMAN DALY & LINDGREN, LTD.**, 8300 Norman Center Drive, Suite 1000, Minneapolis, MN 55437, for plaintiffs.

Cheryl A. Hood Langel and Robert L. McCollum, **MCCOLLUM CROWLEY MOSCHET MILLER & LAAK, LTD**, 7900 Xerxes Avenue South, Suite 700, Minneapolis, MN 55431, for defendant.

Defendant State Auto Insurance Co. ("State Auto") provided insurance to construction contractor Kuepers Construction, Inc. ("Kuepers") under a commercial general liability ("CGL") policy. Kuepers designed and constructed homes in a common interest community in Nisswa, Minnesota (the "Development"), which Interlachen Properties, LLC (the "LLC") sold to members of the Interlachen Propertyowners Association, Inc. ("Interlachen"). After discovering a number of design and workmanship defects in the buildings, Interlachen sued Kuepers and the LLC in Crow Wing County District Court. Kuepers and the LLC eventually executed *Miller-Shugart*

agreements[1] with Interlachen. Interlachen, Kuepers, and the LLC (collectively, "Plaintiffs") now seek enforcement of those agreements against State Auto and also allege that State Auto breached its contractual duties to defend and indemnify Kuepers and the LLC. State Auto moves for summary judgment on all of Plaintiffs' claims. For the reasons described below, the Court will grant in part and deny in part State Auto's motion for summary judgment.

## BACKGROUND[2]

### I.    THE INTERLACHEN DEVELOPMENT

Kuepers designed and constructed the Development – a community of townhomes resembling log cabins – in Nisswa, Minnesota, between November 1997 and July 2001. (Aff. of Robert L. McCollum ("McCollum Aff."), Ex. 1 ("State Court Order") at 3-4, Sept. 28, 2016, Docket No. 65.)[3] Kuepers did not use subcontractors. (*E.g.*, *id.*, Ex. 2 at 227:22-228:2, 232:12-14, 239:25-240:25.) The LLC contracted with Kuepers to build the

---

[1] A *Miller-Shugart* agreement is a settlement between a plaintiff and an insured defendant when the insurer has either denied coverage for the plaintiff's claims or the existence of coverage is in doubt. The insured stipulates to entry of judgment against the insured; in exchange, the plaintiff agrees to only pursue collection of the judgment from the insurer, with coverage generally determined in a subsequent proceeding between the plaintiff and the insurer. *See generally Miller v. Shugart*, 316 N.W.2d 729, 732-36 (Minn. 1982).

[2] Kuepers (a corporation), the LLC (a limited liability company), and Interlachen (a non-profit corporation) are all Minnesota citizens. State Auto is a corporation with its principal place of business in Ohio and is not a citizen of Minnesota but does business in Minnesota. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). The parties agree that Minnesota law applies.

[3] The Development consists of 24 units: 10 duplexes (units 1-20), 1 triplex (units 30-32), and a lodge (unit 33). (State Auto's Mem. in Supp. of Summ. J. at 3, Sept. 28, 2016, Docket No. 64.)

Development, sold the units in the Development between July 1998 and September 2001, and "issued construction-related warranties regarding the Units to the buyers." (State Court Order at 4-6; McCollum Aff., Ex. 3; Decl. of Douglas Kuepers ¶ 5, Nov. 11, 2014, Docket No. 16.) The Development is a "common interest community" as defined in Minn. Stat. § 515B.1-103(10);[4] the LLC was the development's "declarant."[5] (McCollum Aff., Ex. 5 ("State Court Compl.") ¶ 3.) Interlachen is the association of unit-owners in the Development. (State Court Order at 3.)

## II. THE RELEVANT INSURANCE POLICIES

State Auto provided CGL insurance coverage (under the "CGL Policy") to Kuepers between December 26, 2001 and December 1, 2011.[6] (Aff. of Steve Kuepers ("Kuepers Aff.") ¶¶ 5-8, Oct. 19, 2016, Docket No. 71.) State Auto was Kuepers's only

---

[4] Section 515B.1-103(10) defines "common interest community" as:

contiguous or noncontiguous real estate within Minnesota that is subject to an instrument which obligates persons owning a separately described parcel of the real estate, or occupying a part of the real estate pursuant to a proprietary lease, by reason of their ownership or occupancy, to pay for (i) real estate taxes levied against; (ii) insurance premiums payable with respect to; (iii) maintenance of; or (iv) construction, maintenance, repair or replacement of improvements located on, one or more parcels or parts of the real estate other than the parcel or part that the person owns or occupies.

[5] The "declarant" of a "common interest community" is the person who has either "executed a declaration" – the instrument that "creates a common interest community" – and/or "offered prior to creation of the common interest community to transfer their interest in a unit [of the community] to be created and not previously transferred." Minn. Stat. § 515B.1-103(15)-(16).

[6] The policy number changed over the years, but the details of the applicable policies remained constant. (*See* Kuepers Aff. ¶¶ 5-8; McCollum Aff. ¶ 9.)

CGL insurer during this period. (*Id.* ¶ 9.) The limits for the CGL Policy were $1,000,000 for each occurrence and $2,000,000 for general aggregate. *(Id.* ¶¶ 5-8; *see also id.*, Exs. A-C; McCollum Aff., Ex. 8 ("CGL Policy").) Subject to a number of exclusions and limitations, the CGL Policy generally covered "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage,'" as long as the property damage took place during the coverage period and was caused by an "occurrence" in the "coverage territory." (CGL Policy at 8.) The CGL Policy included the following exclusions:

L.    Damage To Your[7] Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m.    Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(*Id.* at 11.) The CGL Policy also included the following definitions:

---

[7] The CGL Policy defined "you" and "your" to "refer to the Named Insureds." (CGL Policy at 8.)

3.    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . . .

13.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

16.    "Products-completed operations hazard":

a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)    Products that are still in your physical possession; or

(2)    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

. . . .

17.    "Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

. . . .

22.   "Your work":

    a.    Means:

        (1)    Work or operations performed by you or on your behalf; and

        (2)    Materials, parts or equipment furnished in connection with such work or operations.

    b.    Includes

        (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        (2)    The providing of or failure to provide warnings or instructions.

(*Id.* at 17, 19-20.)

The CGL Policy obligated State Auto to defend Kuepers (and any other insured) against any lawsuit seeking covered damages. (*Id.* at 8.) But State Auto had "no duty to defend [Kuepers or any other] insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which [the CGL Policy] d[id] not apply." (*Id.*)

## III.   THE CONSTRUCTION-DEFECT ACTION

Starting in 2004, Interlachen discovered defects in and damage to the buildings in the Development, including discolored and peeling wood siding attributable to high levels of moisture in the logs. (State Court Order at 7-10.) In April 2011, Interlachen commenced a construction-defect action against Kuepers and the LLC in Crow Wing County District Court. (*Id.* at 10; *see also* McCollum Aff., Ex. 4.) After amending the complaint, Interlachen's claims against Kuepers included: breach of contract; breach of statutory and implied warranties; intentional and/or negligent misrepresentation;

negligence; breach of the duty of good faith and fair dealing; professional engineering and design negligence; negligent repair; and equitable estoppel. (State Court Compl. ¶¶ 33-49, 61-116.)[8] Interlachen also alleged breach of express warranties, breach of implied warranties, and negligence against the LLC. (*Id.* ¶¶ 50-60, 79-87.) In the amended complaint, Interlachen alleged the following under the heading "**<u>DAMAGES</u>**":

> The cost to correct the building code violations, remedy the construction defects and product failures, and repair the damage to the [Development], including the Townhomes, is believed to exceed $50,000.00. In addition, as a result of the building code violations, construction defects, product failures, and related damage, the value of the [Development], including the Townhomes, is believed to have been impaired and diminished in an amount greater than $50,000.00.

(*Id.* ¶ 32.) In the end, Interlachen produced professional estimates of between approximately $5.4 million and $5.5 million for the cost of remedying the defective construction and negligent repairs. (Aff. of Lauris A. Heyerdahl ("Heyerdahl Aff."), Ex. G at 73, Oct. 19, 2016, Docket No. 70 (approximately $5.38 million); *id.*, Ex. H at 1682:2-7 (approximately $5.5 million); *id.*, Ex. J at 1280:8-15 (approximately $5.4 million).)

---

[8] Interlachen alleged that the townhomes in the Development were not constructed in accordance with industry standards and applicable building codes because of failure to properly install and seal log siding, install a weather resistant barrier, install windows, insulate around windows and penetrations, grade the lots, ventilate the ceilings, frame under windows, and comply with "braced-framing requirements." (State Court Compl. ¶ 23.)

Both Kuepers and the LLC notified State Auto about Interlachen's lawsuit. Kuepers tendered defense of all but the design-defect claims to State Auto.[9]  State Auto provided a defense to Kuepers subject to a Reservation of Rights dated April 12, 2011. (McCollum Aff., Ex. 6 at 1.)  State Auto hired the law firm Cousineau McGuire to defend Kuepers at no cost to Kuepers.  (*Id.*)  State Auto did not provide any defense to the LLC; the LLC hired its own counsel.

On January 4, 2013, the state court granted summary judgment to the LLC and granted partial summary judgment to Kuepers.  (State Court Order at 30-31.)  The state court dismissed most claims as barred by the applicable statutes of limitations, including: breach of contract, breach of implied warranty, breach of express warranty, intentional and/or negligent misrepresentation, breach of the duty of good faith and fair dealing, negligence, and professional engineering and design negligence.  (*Id.* at 20-23, 26 (citing the applicable statutes of limitations at Minn. Stat. §§ 515B.4-115(c), 541.051, subd. 1(a)).)  The only claims that remained after summary judgment were (1) the statutory warranty claims against Kuepers based on Minn. Stat. ch. 327A[10] as to

---

[9] Kuepers's professional-liability carrier defended Kuepers on the design-defect claims. (Heyerdahl Aff., Ex. E.)

[10] Minnesota Statutes section 327A.02 sets forth three statutory warranties (good for one, two and ten years) that are implied as a matter of law in every sale of a completed dwelling.  The one-year warranty covers "defects caused by faulty workmanship and defective materials due to noncompliance with building standards."  Minn. Stat. § 327A.02, subd. 1(a).  The ten-year warranty covers "major construction defects due to noncompliance with building standards."  *Id.*, subd. 1(c).  Under Minn. Stat. § 327A.05, a plaintiff purchasing a new home has a cause of action for damages arising out of the breach or for specific performance, with damages limited to either the amount necessary to remedy the defect/breach or the difference between the value of the dwelling with the defect and the value of the dwelling without the defect.

seventeen of the twenty-four units – claims that the court held were not time-barred – and (2) the negligent repairs claim against Kuepers for work performed as late as 2009.  (*Id.* at 23-24.)

A few weeks before trial, on November 15, 2013, State Auto sent Kuepers an Updated Reservation of Rights.  (McCollum Aff., Ex. 7.)  The letter stated that "breach of warranty claims are not covered" under the CGL Policy and that State Auto would "only be able to consider indemnification for negligence/negligent repair work **causing any resulting damage**."  (*Id.* at 1 (emphasis added).)  The letter reiterated that the CGL Policy did not cover "[p]roperty damage" to "your work" (referring to Kuepers's work).  (*Id.* at 2.)  The letter also explained that the CGL Policy was "not intended to be a warranty or guarantee of your workmanship" and indicated that Kuepers "may wish to consult its own personal counsel regarding this matter."  (*Id.* at 4.)  Kuepers argues that this was the first time that State Auto asserted that it would raise a variety of defenses to coverage of the claims going to trial, but the record shows State Auto's defense was, from the beginning, subject to a Reservation of Rights.  (*See* McCollum Aff., Ex. 6 at 1 ("Unfortunately, it appears the policy may not cover you for some or all aspects of this claim.  This is not a coverage denial but, based on the facts as we know them, coverage is uncertain right now, or may be significantly limited. . . .  The company reserves their right under the policy to deny coverage to you, or anyone claiming coverage under this policy based on the policy language and facts of the case.").)

The remaining claims went to trial in December 2013; the jury awarded Interlachen $2,147,000.  (*Id.*, Ex. 14 at 1, 3; *id.*, Ex. 15.)  The jury found that Kuepers

breached the one-year statutory warranty pursuant to § 327A.02(a),[11] which was a "direct cause" of "damages to [all seventeen units]." (*Id.*, Ex. 14 at 1; *see also id.*, Ex. 15 at 1-2.) The jury found that "the amount of money required to fairly and adequately compensate [Interlachen] for its damages to each particular unit" was $125,000 per unit for units 1-6 and 12-20 and $94,000 per unit for units 30-31. (*Id.*, Ex. 14 at 2; *id.*, Ex. 15 at 4.) The jury also found that Kuepers was negligent in the performance of repair work and maintenance at the Development, and that this negligence directly caused "[Interlachen]'s damages," for which $120,000 would be to "fair[] and adequate[]" compensation.[12] (*Id.*, Ex. 14 at 2; *id.*, Ex. 15 at 5.)

The state court entered judgment against Kuepers on February 10, 2014, for the amount of the jury's verdict. (*Id.*, Ex. 14 at 3.) After the entry of judgment, Interlachen sought an award of $757,875.15 in costs and disbursements, including interest. (Heyerdahl Aff., Ex. O at 119.) On May 15, 2014, the state court awarded $132,487.82 in costs to Interlachen and also ordered that Interlachen was "entitled to interest which shall be calculated by the Court Administrator."[13] (McCollum Aff., Ex. 16 at 3; Heyerdahl Aff., Ex. Q at 141.)

---

[11] The jury found Kuepers did not breach the ten-year statutory warranty in § 327A.02(c). (McCollum Aff., Ex. 14 at 1; *id.*, Ex. 15 at 2.)

[12] However, the jury found that in relation to the negligent repairs claims, Interlachen was 30% contributorily negligent (resulting in an award of $84,000 on those claims). (McCollum Aff., Ex. 14 at 2-3; *id.*, Ex. 15 at 5.)

[13] The Court Administrator never calculated interest because of the subsequent *Miller-Shugart* agreement.

The state court initially stayed the February judgment pending appeal conditioned on Kuepers posting a supersedeas bond in the full amount of the judgment by February 21, 2014, later extended to February 26, 2014. (McCollum Aff., Ex. 14 at 3; Heyerdahl Aff., Ex. L.) Kuepers asked State Auto to furnish the bond on its behalf to stay collection efforts, since Kuepers was on the verge of bankruptcy and could not qualify for a bond of the required size in its own name.[14] (*See* McCollum Aff., Ex. 17 at 69; *id.*, Ex. 18 at 1; Kuepers Aff. ¶¶ 13, 15.) By that point, State Auto's coverage position was that the CGL Policy did not cover the judgment and that the CGL Policy also did not obligate State Auto to procure a supersedeas bond for Kuepers. (McCollum Aff., Ex. 23.)

State Auto refused to procure a supersedeas bond for Kuepers, and Kuepers failed to post the required bond. In March 2014, Interlachen began the collection process through post-judgment discovery. (*Id.*, Ex. 52.) On April 1, 2014, Interlachen served Kuepers with a Demand for Disclosure of assets and finances. (Heyerdahl Aff., Exs. U-V.) When Kuepers did not provide the requested information, Interlachen moved the state court to find Kuepers in contempt and to confine the company's CEO, Doug Kuepers, until Kuepers complied with the Demand for Disclosure. (Heyerdahl Aff., Ex. W.)

Michael Barrett – the attorney at Cousineau McGuire that State Auto hired to defend Kuepers – and State Auto proceeded with plans to appeal the judgment, while

---

[14] In other words, Kuepers wanted State Auto to apply for and collateralize a supersedeas bond in State Auto's name on Kuepers's behalf.

Kuepers's independently-retained attorneys – Mike McGrath and Chris Yetka – focused on settlement. In March 2014, Barrett filed two post-trial motions on Kuepers's behalf. (*See id.*, Ex. 22.) But Interlachen and Kuepers (represented by McGrath) were negotiating a possible *Miller-Shugart* agreement at the time. (*Id.*, Ex. 27.) Because a state court ruling on the post-trial motions could have damaged the negotiations, in late June 27, 2014, Interlachen and Kuepers submitted a joint letter to the state court asking it to delay ruling on the post-trial motions. (*See id.*, Exs. 28, 31.) Plaintiffs allege that despite repeated requests that they engage in settlement discussions, Barrett and State Auto "never made a realistic settlement offer to [Interlachen] following the entry of judgment," (Kuepers Aff. ¶ 16), and instead were determined to appeal the verdict even though execution of judgment could force Kuepers into bankruptcy. On the other hand, State Auto contends that it made genuine efforts to settle on Kuepers's behalf. (*See, e.g.*, McCollum Aff., Exs. 23, 25.)

On July 28, 2014, Kuepers and Interlachen executed a *Miller-Shugart* agreement ("Agreement 1") that included stipulation to a judgment of $2,940,875.15 that Interlachen could collect exclusively from "State Auto, CNA and the Liability Insurers." (McCollum Aff., Ex. 32 at 5-6.) Agreement 1 expressly excluded the design-defect claims (which were covered under Kuepers's separate policy with its professional-liability carrier), as well as the claims against the LLC. (*Id.* at 5-6.)

On August 5, 2014, Interlachen and Kuepers submitted Agreement 1 to the state court for approval. (McCollum Aff., Ex. 38.) Over State Auto's objections, on August 7, 2014, the state court issued an order approving of Agreement 1; the state court

subsequently entered judgment for the stipulated amount of $2,940,875.15 against Kuepers. (*Id*., Exs. 30, 38.)

On August 22, 2014, Interlachen filed a notice of appeal of the state court's dismissal of the design-defect claims and the claims against the LLC. (*Id.*, Ex. 44; Heyerdahl Aff., Ex. Z.) Facing the prospect of liability as a result of the appeal, on August 28, 2014, the LLC entered into a *Miller-Shugart* agreement with Interlachen ("Agreement 2"), in which the LLC stipulated to a judgment of $2,059,125 against the LLC, to be collected only from State Auto or "any other insurer from whom [the LLC] is entitled to indemnification." (McCollum Aff., Ex. 40 at 3-4.) On September 24, 2014, over State Auto's objections, the state court approved of Agreement 2 and entered judgment of $2,059,125 against the LLC. (McCollum Aff, Exs. 34-35, 41).

Kuepers and Interlachen also executed a third *Miller-Shugart* agreement, pertaining to the professional negligence claims only, which is not a subject of this action. The three *Miller-Shugart* agreements put an end to the state-court litigation.

IV. **PROCEDURAL HISTORY**

The LLC commenced this action in Crow Wing County on October 8, 2014, naming State Auto, Kuepers, and Interlachen as defendants. (Notice of Removal, Ex. 1 ("Compl.") at 1, Oct. 17, 2014, Docket No. 1.) State Auto removed the action to federal court. (Notice of Removal at 1.)

The LLC and Kuepers allege State Auto breached its obligations under the CGL Policy to defend and indemnify them in the state-court action and, among other claims,

that State Auto also breached its fiduciary duty and the implied covenant of good faith and fair dealing.[15] (Compl. at 13-17; Kuepers's Answer & Cross-cl. Against State Auto ("Kuepers Answer") at 11-13, Nov. 14, 2014, Docket No. 28.)  The LLC and Kuepers seek damages, costs, and fees. (Compl. at 17-18; Kuepers Answer at 13-14). Plaintiffs seek enforcement of both Agreements. (Compl. at 14, 18; Kuepers Answer at 14; Interlachen's Answer, Cross-cl. & Countercl. ("Interlachen Answer") at 13, Nov. 14, 2014, Docket No. 27.)  Interlachen seeks orders of garnishment allowing it to collect these judgments from State Auto as well as to garnish any award that Kuepers or the LLC wins in this litigation. (Interlachen Answer at 13.)

State Auto seeks a declaratory judgment that both Agreements are unenforceable. (State Auto's Answer & Countercl. to the LLC's Compl. at 18-21, Oct. 28, 2014, Docket No. 10.)  State Auto also seeks fees and costs from the LLC, alleging that the LLC "brought this claim with full knowledge that it never purchased insurance coverage from State Auto, that it never paid a premium for insurance coverage to State Auto, that it is not a named insured or other insured under any policies of insurance provided by State Auto, and because it has no liability to [Interlachen]." (*Id.* at 21.)

State Auto moved for realignment of the parties on October 28, 2014, arguing that Interlachen's and Kuepers's interests are aligned with the LLC's. (State Auto's Mem. in Supp. of Mot. for Realignment at 1, Oct. 28, 2014, Docket No. 6).  On November 11,

---

[15] Plaintiffs have not briefed a response to State Auto's motion to dismiss the claims for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing. Therefore, the Court considers these claims abandoned. *See Luckey v. Alside, Inc.*, No. 15-2512, 2017 WL 1183974, at *4 (D. Minn. Mar. 29, 2017).

2014, the LLC moved for remand based on lack of diversity. (The LLC's Mot. to Remand, Nov. 11, 2014, Docket No. 12.) On September 30, 2015, the Court affirmed the Magistrate Judge's order granting State Auto's motion to realign the parties and denying the LLC's motion to remand. (Mem. Op. & Order, Sept. 30, 2015, Docket No. 43.)

State Auto filed the instant motion for summary judgment on September 28, 2016, seeking dismissal with prejudice of all claims against it.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence

sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009).

## II.     BREACH OF CONTRACT

Kuepers and the LLC claim that State Auto breached a contractual duty to defend and indemnify them in the underlying construction defect action.  "An insurer's duty to defend its insured arises when any part of the claim against the insured is arguably within the scope afforded by the policy." *Auto-Owners Ins. Co. v. Todd*, 547 N.W.2d 696, 698 (Minn. 1996).  "An insurer seeking to escape its duty to defend has the burden of establishing that all parts of the cause of action fall clearly outside the scope of coverage." *Id.*  "To determine whether a duty [to defend] exists, the allegations in the underlying complaint and the surrounding facts will be compared with the relevant language in the insurance policy." *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 576 (Minn. 2009).  An insurer has "a duty to defend if any part of the claims asserted against [the insured] in the underlying case 'arguably' falls within the scope of coverage." *Ross v. Briggs & Morgan*, 540 N.W.2d 843, 847 (Minn. 1995). "When an insurer has a duty to defend a liability claim for which it questions coverage, the insurer must expressly inform its insured that it accepts defense of the claim subject to its right to later contest coverage of the claim based on facts developed at trial." *Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 616 (Minn. 2012).  "An insurer that fails to make such a reservation of rights is estopped from later denying coverage of the claim, up to the policy limits." *Id.*

"An insurer's duty to defend is distinct from . . . the duty to indemnify." *Franklin*

*v. W. Nat'l Mut. Ins. Co.*, 574 N.W.2d 405, 406 (Minn. 1998).

> The duty to defend is broader than the duty to indemnify in three ways:
> (1) the duty to defend extends to every claim that "arguably" falls within
> the scope of coverage; (2) the duty to defend one claim creates a duty to
> defend all claims; and (3) the duty to defend exists regardless of the merits
> of the underlying claims.

*Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006). "[A]n

insurer has a duty to indemnify when its insured is found liable for a third-party claim

within the terms of the liability insurance policy, but an insurer has no duty to indemnify

when its insured is found liable for a third-party claim that is outside the policy's scope."

*Remodeling Dimensions, Inc.*, 819 N.W.2d at 616.

**A.     Kuepers**

**1.     Duty to Defend Kuepers**

There is no question that State Auto was obligated to defend Kuepers in the state-

court action.  State Auto provided Kuepers with a defense, at no cost to Kuepers, until

Kuepers settled with Interlachen after trial.  But Plaintiffs argue that State Auto breached

the duty to defend Kuepers when it refused to procure a supersedeas bond on Kuepers's

behalf in order to stay the judgment against Kuepers.  Plaintiffs argue that both the CGL

Policy and Minnesota law[16] obligated State Auto to procure the bond on Kuepers's

behalf.

---

[16] The one Minnesota case Plaintiffs cite, *Powers v. Wilson*, 166 N.W. 401 (Minn. 1918),
is not on-point.

Plaintiffs acknowledge that the CGL Policy does not contain language explicitly obligating State Auto to furnish a supersedeas bond. The CGL Policy does obligate State Auto to pay "[t]he cost of bonds to release attachments," but it also clarifies that State Auto "do[es] not have to furnish these bonds." (CGL Policy at 21.) The thrust of Plaintiffs' argument is that an obligation to furnish the bond is encompassed within the broader duty of the insurer to adequately defend the insured.

Inferring an obligation to furnish a supersedeas bond on behalf of an insured conflicts with the CGL Policy's statement that "[n]o other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for." *(Id.* at 8.) Additionally, a deep tension with the overarching principle that an insurer is only required to provide indemnification for claims for which there is insurance coverage would result if, as Plaintiffs argue, State Auto's contractual duty to defend implied a duty to collateralize a supersedeas bond.

> If [State Auto] were to post the bond, in the event of an unsuccessful appeal, [State Auto] would be "required to functionally indemnify [Kuepers] by forfeiting the bond for the trial judgment. Requiring insurers to assume a broader duty to defend on this topic, then, may result in an insurer having to indemnify an insured for a claim that the policy does not cover."

*See James River Ins. Co. v. Interlachen Propertyowners Ass'n*, No. 14-3434, 2016 WL 3093383, at *6 (D. Minn. June 1, 2016) (third alteration in original) (quoting *Charter Oak Ins. Co. v. Maglio Fresh Food*, 45 F. Supp. 3d 461, 476 (E.D. Pa. 2014)).

Furthermore, even if the policy language requiring State Auto to pay the "costs" of bonds to release attachments somehow implied State Auto must also pay the "costs" of

supersedeas bonds, State Auto still had no obligation to **furnish** bonds of either type, under the plain terms of the CGL Policy. (CGL Policy at 21); *see also James River Ins. Co.*, 2016 WL 3093383, at *5-6 (explaining the distinction between a contract requiring payment of the "cost" of a bond, which specifies the costs of funding a bond's premium, and "furnishing," or collateralizing, a bond). Because State Auto did not have a contractual duty to furnish a supersedeas bond on Kuepers's behalf, State Auto's refusal to furnish such a bond did not amount to a breach of contract.

### 2.    Duty to Indemnify Kuepers

Plaintiffs also argue that State Auto's refusal to pay the state-court judgment against Kuepers, or to indemnify Kuepers for that judgment when it was entered, was a breach of State Auto's duty to indemnify Kuepers. Again, the Court notes that State Auto was not obligated to provide indemnification for claims with no underlying coverage. *See Travelers Prop. Cas. Co. of Am. v. Klick*, No. 15-2403, 2016 WL 5349430, at *5 (D. Minn. Sept. 23, 2016) ("The duty to indemnify requires an insurer to pay damages that the insured is legally obligated to pay for covered claims, and it 'arises only if the insured ultimately proves up facts showing coverage.'" (quoting *Nelson v. Am. Home Assurance Co.*, 842 F. Supp. 2d 909, 915 (D. Minn. 2011))), *appeal filed*, No. 16-4000 (8th Cir. Oct. 21, 2016). State Auto validly provided Kuepers with a defense subject to a Reservation of Rights which, from the beginning, made clear that the "your work" exclusion might apply to some or all of Interlachen's claims. (McCollum Aff., Ex. 6 at 3-4.) At trial, Interlachen provided evidence of damages equal the amount it would cost to

remedy Kuepers's faulty workmanship. Plaintiffs have not explained or provided evidence of any resulting damages that would not be subject to the "Damage to Your Work" exclusion. Therefore, State Auto's good-faith coverage position – that the statutory warranty and negligent repairs claims were not covered claims – did not amount to a breach of State Auto's duty to indemnify Kuepers for covered claims.

### B. The LLC

#### 1. Duty to Defend the LLC

Turning to the LLC's breach of contract claims, State Auto would have had a duty to defend the LLC in the state-court action if the LLC was an "insured" and one or more claims against the LLC were "arguably" covered claims. *Ross*, 540 N.W.2d at 847.

First, the Court considers whether the LLC was an "insured." The CGL Policy defines "insured" as follows:

> SECTION II – WHO IS AN INSURED
>
> 1. If you are designated in the Declarations as:
>
> . . . .
>
> c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
>
> . . .
>
> 2. Each of the following is also an insured:
>
> . . . .
>
> b. Any person . . . or any organization while acting as your real estate manager.

(CGL Policy at 14-15.)

Plaintiffs argue the LLC was an "insured" under Kuepers's CGL Policy because Interlachen sued the LLC for actions taken while the LLC was acting in its capacity as Kuepers's "real estate manager." State Auto argues that the LLC was not an insured because it was not listed in the Declarations page of the policy and also because the LLC was not acting as Kuepers's "real estate manager." State Auto does not consider the LLC's involvement in project management during the building of the Development or its sale of the units in the Development to be activities carried out by a "real estate manager." (State Auto's Mem. in Supp. of Summ. J. at 27-28, Sept. 28, 2016, Docket No. 64.)

Addressing State Auto's argument that the LLC is not an "insured" because it is not listed on the CGL Policy's Declarations, the Court finds that a plain reading of the CGL Policy shows that "insured" includes "any organization" acting as Kuepers's "real estate manager," even if the "real estate manager" is not listed in the Declarations. Section 1 of the definition of "insured" refers to those listed on the Declarations page, while Section 2 defines those that are "insureds" **in addition to** those listed in the Declarations. (*See* CGL Policy at 14 ("Each of the following is **also** an insured" (emphasis added)).) Therefore, the LLC was an "insured" if it was acting as Kuepers's "real estate manager."

The activities over which Interlachen originally sued the LLC were: (1) "statements or representations [to buyers] regarding the quality of the construction and design of [the Development]" made by the LLC in its capacity as "declarant," allegedly constituting express warranties under Minn. Stat. § 515B.4-112; (2) warranties

the LLC made in its capacity as "declarant," by virtue of selling units to buyers, as implied by statute, *see* Minn. Stat. § 515B.4-113; and (3) negligence in the building of the Development, to the extent the LLC was involved in building. (State Court Compl. ¶¶ 50-60, 79-87.) The question for the Court is whether the evidence viewed in the light most favorable to Plaintiffs could demonstrate that the LLC acted as Kuepers's "real estate manager" in carrying out those activities.

"Summary judgment is inappropriate where terms of a contract are at issue and those terms are ambiguous or uncertain. If, however, terms of the contract may be given their plain and ordinary meaning, construction of the contract is a matter for the court and summary judgment may be appropriate." *Bank Midwest, Minn., Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004) (citation omitted).

The CGL Policy does not define the term "real estate manager." But the provision including "real estate managers" in the definition of "insured" is standard CGL-policy language, and a number of courts have interpreted the term "real estate manager" in this context to be unambiguous. *See Ins. Co. of N. Am. v. Hilton Hotels U.S.A., Inc.*, 908 F. Supp. 809, 815 (D. Nev. 1995) (collecting cases). In *QBE Ins. Corp. v. Creston Court Condominium, Inc.*, the district court determined the "plain and ordinary meaning" of the term "real estate manager" is "one who conducts, directs or supervises another's real estate." 58 F. Supp. 3d 1137, 1150 (D. Or. 2014).

Turning to the question of whether the LLC falls within the definition of a "real estate manager," the Court finds that viewing the evidence in the light most favorable to Plaintiffs, there is a question of fact as to whether Interlachen's claims against the LLC

were based on actions the LLC undertook in its capacity as Kuepers's real estate manager. For example, Interlachen's original state-court complaint alleges that the LLC was involved in the process of managing the building process of the Development. (State Court Compl. ¶¶ 79-87.) The record is not particularly well-developed regarding the LLC's role in the Development because the LLC was dismissed from the state case at a relatively early stage. But there is at least a plausible argument, based on the record before the Court, that the LLC was acting as Kuepers's real estate manager with respect to the Development when the LLC was involved in managing activities related to the Development before the units were sold. For this reason, the Court cannot grant summary judgment in favor of State Auto based on a conclusion as a matter of law that the LLC is not an insured because it was not acting as Kuepers's "real estate manager." Instead, the Court assumes at summary judgment that the LLC is an "insured" under the CGL Policy in relation to all of Interlachen's claims against the LLC.

State Auto argues that even if the LLC is an insured, the "Damage To Your Work" exclusion applies to all claims against the LLC. (*See* CGL Policy at 11.) But the question for the Court is not whether, with the benefit of hindsight, it is clear that the only damages Interlachen actually sought were subject to the "Damage To Your Work" exclusion. Instead, the question is whether State Auto has met its burden to establish that all of the claims against the LLC, as articulated in the State Court Complaint, were not "arguably within the scope afforded by the policy." *Auto-Owners Ins. Co.*, 547 N.W.2d at 698.

In the state-court action, Interlachen alleged the LLC was involved in the process of building the Development, including management of the building process, and that the LLC acted negligently. (State Court Compl. ¶¶ 79-87.) Interlachen generally alleged damages including "resulting physical damage." (*Id.* ¶ 87.) Assuming the LLC was an insured, the Court finds State Auto has not met its burden of establishing that the negligence claim against the LLC was not "arguably" within the scope of the CGL Policy, since it was possible at the outset of the litigation that Interlachen might produce evidence of resulting damages not subject to the "Damage To Your Work" exclusion.

Additionally, State Auto acknowledged in its April 2011 Reservation of Rights letter that it was unable to determine at that time if the allegations in Interlachen's lawsuit fall under the definition of an "occurrence." (McCollum Aff., Ex. 6 at 3.) Presumably, the same logic could apply to the claims against the LLC, and therefore, though State Auto now argues there was no "occurrence" giving rise to property damage, that issue was not clear at the time State Auto refused to recognize a duty to defend the LLC.

Thus, there is evidence in the record that could give rise to a finding that there was arguably coverage for the negligence claim against the LLC. Therefore, the Court declines to hold as a matter of law that State Auto had no duty to defend the LLC.

### 2. Duty to Indemnify the LLC

Although State Auto may have had a duty to defend the LLC and may have breached that duty, this does not resolve whether State Auto breached the separate, narrower duty to indemnify the LLC. The CGL Policy obligates State Auto to indemnify

insureds only for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" (CGL Policy at 8.) Here, the LLC won at summary judgment in state court. Other than as stipulated in Agreement 2, there was no judgment entered against the LLC and the LLC made no payments to Interlachen in relation to any settlement. And while Agreement 2 did result in a judgment entered against the LLC, under the terms of the settlement, the LLC was at no time "legally obligated to pay" the judgment. (*Id.*; *see* McCollum Aff., Ex. 40 at 4 (explaining, in Agreement 2, that Interlachen agreed not to seek to collect from the LLC the stipulated judgment entered against the LLC). Under the plain terms of the CGL Policy there was nothing for State Auto to indemnify, and thus, Plaintiffs have failed to show that State Auto breached a contractual duty to indemnify the LLC.[17]

## III. ENFORCEABILITY OF THE *MILLER-SHUGART* AGREEMENTS

Next the Court considers the enforceability of the Agreements – Plaintiffs argue both Agreements are enforceable against State Auto, while State Auto takes the opposite position.

---

[17] The LLC alleges that "[o]nce judgment had been entered [against Kuepers], and after settlement discussions had failed, State Auto denied all coverage to Kuepers for the verdict amount, thereby breaching its obligation to indemnify both Kuepers **and [the] LLC** for covered property damage under the [CGL Policy]." (Compl. at 10 (emphasis added).) But the fact that State Auto denied coverage for the verdict against Kuepers does not amount to a refusal to indemnify **the LLC** – a legally distinct entity. The LLC further alleges that the fact that State Auto "refused to purchase or obtain an appeal bond on behalf of either [the] LLC or Kuepers" amounted to a breach of "State Auto's defense obligations to both [the] LLC and Kuepers." (*Id.*) But State Auto only refused to obtain an appeal bond on behalf of Kuepers. Because the state court granted summary judgment in favor of the LLC, there was never any requirement that the LLC post a supersedeas bond, as the LLC had nothing to appeal.

When an insurer denies an insured coverage for claims made against the insured, the insured and the claimant may execute a *Miller-Shugart* agreement by settling "on a judgment for an amount collectible from the insurance policy. The claimant releases the insured from personal liability and the claimant's recovery is limited to the amount obtained from the insurers." *Corn Plus Coop. v. Cont'l Cas. Co.*, 516 F.3d 674, 677 n.2 (8th Cir. 2008).

"While a Miller-Shugart judgment settles the issue of the underlying defendant's liability to the plaintiff, it does not resolve the question of whether the insurance policy provides coverage for that liability." *Nelson v. Am. Home Assurance Co.*, 702 F.3d 1038, 1041 (8th Cir. 2012) (applying Minnesota law). "[I]f there is found to be no coverage for the *Miller-Shugart* judgment, that ends the matter." *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990); *see also Miller v. Shugart*, 316 N.W.2d 729, 734 (Minn. 1982) (explaining that if the insurer who contests coverage takes the risk of declining to participate in settlement negotiations that ultimately result in a *Miller-Shugart* agreement, the insurer "escapes the risk if it should be successful on the coverage issue, and, in that event, it is plaintiff who loses").

Coverage is determined by the terms of the insurance policy. *Nelson*, 702 F.3d at 1041. "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). "To establish or trigger coverage under an occurrence-based policy, 'an insured must demonstrate that damage "occurred" while the policy was in effect.'" *Parr v. Gonzalez*, 669 N.W.2d 401,

406 (Minn. Ct. App. 2003) (quoting *N. States Power Co. v. Fid. & Cas. Co.*, 523 N.W.2d 657, 659-60 n.3 (Minn. 1994)).

"When insurance policy language is clear and unambiguous, 'the language used must be given its usual and accepted meaning.'" *Wanzek Constr., Inc. v. Emp'rs Ins. of Wausau*, 679 N.W.2d 322, 324-25 (Minn. 2004) (quoting *Lobeck v. State Farm Mut. Auto Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998)). If policy language is ambiguous, it must be interpreted in favor of coverage. Exclusions are read narrowly against the insurer." *Id.* at 325 (quoting *Nordby v. Atl. Mut. Ins. Co.*, 329 N.W.2d 820, 822 (Minn. 1983)).

If an insurance policy does provide coverage for some or all of the settled claims, then the next question is whether the agreement is enforceable against the insurer. "A Miller-Shugart agreement is enforceable against an insurer if it meets three conditions: the insured provided notice to its insurer of its intent to enter into such agreement; the settlement is not the product of fraud or collusion; and the settlement is reasonable and prudent." *Corn Plus*, 516 F.3d at 680; *see also Brownsdale Coop. Ass'n v. Home Ins. Co.*, 473 N.W.2d 339, 341 (Minn. Ct. App. 1991) (same). Furthermore, when the agreement purports to cover multiple defendants or a mix of covered and non-covered claims, the agreement must explicitly allocate damages to each claim and/or each defendant. *Corn Plus*, 516 F.3d at 681. When a settlement fails to allocate as required, the settlement is unreasonable as a matter of law and unenforceable. *Id.*

### A.     Agreement 1

First, the Court considers whether there is coverage for the underlying claims settled in Agreement 1.  Agreement 1 states: "Kuepers stipulates to the judgment in favor of [Interlachen] and against Kuepers in the amount of the jury award plus the requested costs and disbursements in the total amount of $2,940,875.15."  (McCollum Aff., Ex. 32 at 5.)  The jury award was based on two claims: breach of statutory warranty and negligent repairs.  State Auto argues the jury award is based on damages that are not covered under the CGL Policy because of the CGL Policy's exclusion from coverage of "Damage To Your Work."

The CGL Policy excludes "Damage To Your Work," as follows: "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'  This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  (CGL Policy at 11.)  And "[y]our work" is defined to include "[w]ork or operations performed by you or on your behalf"; "[m]aterials, parts or equipment furnished in connection with such work or operations"; and "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.'"  (*Id.* at 20.)

The "Damage To Your Work" exclusion amounts to a contractual adoption of the business-risk doctrine.  *See, e.g.*, *Wanzek Constr.*, 679 N.W.2d at 326 (examining the CGL standard-coverage form provision excluding "your work" – an exact match to the exclusion language in the CGL Policy); *O'Shaughnessy v. Smuckler Corp.*, 543 N.W.2d

99, 103-04 & n.1 (Minn. Ct. App. 1996) (interpreting a CGL policy with an exclusion for "[p]roperty damage" to "your work" with a near-identical definition of "your work"), *abrogated on other grounds*, *Gordon v. Microsoft Corp.*, 645 N.W.2d 393 (Minn. 2002). The business-risk doctrine "excludes coverage for property damage caused by the insured's 'faulty workmanship' where the damages claimed are the cost of correcting the work itself." *Remodeling Dimensions, Inc.*, 819 N.W.2d at 611 (quoting *Wanzek Constr.*, 679 N.W.2d at 325-26). The business-risk doctrine is a complement to the basic purpose of CGL policies – to cover "tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Wanzek Constr.*, 679 N.W.2d at 325 (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations: What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971)); *see also Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co.*, 396 N.W.2d 229, 232-37 (Minn. 1986) (discussing the policy rationale for the business-risk doctrine); *Bor-Son Bldg. Corp. v. Emp'rs Commercial Union Ins. Co. of Am.*, 323 N.W.2d 58, 64 (Minn. 1982) ("We are convinced that the standard comprehensive general liability policy does not provide coverage to an insured-contractor for a breach of contract action grounded upon faulty workmanship or materials, where the damages claimed are the cost of correcting the work itself." (quoting *Vernon Williams & Son Constr., Inc. v. Cont'l Ins. Co.*, 591 S.W.2d 760, 765 (Tenn. 1979))).[18]

_____

[18] Plaintiffs argue that Minnesota's interpretation of the "Your Work" exclusion makes

(Footnote continued on next page.)

At trial, Interlachen sought damages related to breach of statutory warranty for the amount of money it would take to remedy faulty construction by Kuepers's employees, including improper installation of windows, siding, and other materials; improper roof and building framing; failure to seal truss bypasses; and failure to maintain proper spacing between logs, shakes and shingles. *See* § 327A.02, subd. 1(a) (explaining that the one-year statutory warranty covers "defects caused by faulty workmanship and defective materials due to noncompliance with building standards"); § 327A.05, subd. 1 (limiting damages for a breach of statutory warranty claim to either the amount necessary to remedy the defect or the difference between the value of the dwelling with the defect and the value of the dwelling without the defect). The damages estimates Interlachen presented at trial were estimates of the cost to repair the faulty workmanship as well as, arguably, to replace other parts of the buildings damaged because of the faulty workmanship. (McCollum Aff., Ex. 2 at 482:15-23, 2553:9-2556:23, *id.*, Ex. 11; Heyerdahl Aff., Ex. G; *id.*, Ex. H at 1668:10-21, 1669:13-1682:13; *id.*, Ex. I; *id.*, Ex. J at 1267:13-1268:8, 1269:9-1280:15). While there may have been some "resulting damage" included in the professional estimates, the only reasonable conclusion is that the jury verdict was based, at least in large part, on the cost of correcting Kuepers's faulty workmanship. Thus, under the CGL Policy's "Damage To Your Work" exclusion, there

---

(Footnote continued.)

the CGL Policy illusory. Given the wide acceptance of the business-risk doctrine, *see Wanzek Constr.*, 679 N.W.2d at 325-26, the Court rejects this argument.

is no coverage for at least some portion of the damages the jury awarded based on breach of statutory warranty.

Even if the Court assumes that there was coverage for some claims settled in Agreement 1, a portion of the jury verdict represented the costs to remedy Kuepers's faulty workmanship. As a result, Agreement 1 encompassed settlement of claims for some damages for which there was no coverage and, looking at the language in Agreement 1, failed to allocate the settlement amount among covered and non-covered claims. Therefore, Agreement 1 is unenforceable as a matter of law.[19&20] *Corn Plus*, 516 F.3d at 681 ("[F]ailure to allocate the settlement amount by damage item precludes enforcement of a Miller-Shugart agreement consisting of covered and noncovered claims.").

### B.     Agreement 2

Similarly, Agreement 2 is enforceable only if the claims it settles are of the type covered by the CGL Policy.[21] On its face, Agreement 2 is ambiguous as to what claims it was intended to settle; there are two possibilities. First, Agreement 2 states that "the parties agree to allocate the [$2,059,125] Settlement Amount as follows: $2,000,000 to **Kuepers'** legal obligation to pay damages because of property damage caused by an

---

[19] When a *Miller-Shugart* agreement is deemed unreasonable, a court may not substitute its own estimate of reasonable damages. *Corn Plus*, 516 F.3d at 681-82.

[20] Because Agreement 1 is unenforceable as a matter of law, the Court does not consider State Auto's additional arguments regarding the viability of Agreement 1.

[21] As noted above, the Court assumes at summary judgment that the LLC is an "insured."

occurrence and $59,125 for damages caused by **Kuepers'** misrepresentation in connection with the repairs undertaken in 2001." (McCollum Aff., Ex. 40 at 3 (emphasis added).) Thus, Agreement 2 could be interpreted as a settlement of claims **against Kuepers**, under a theory that the LLC could have been jointly and severally liable with Kuepers for those damages.

Second, Agreement 2 acknowledges that in the state-court action, Interlachen asserted negligence claims against Kuepers and the LLC for which Interlachen "sought an amount in excess of Five Million Dollars," and the $2,940,875.15 stipulated settlement in Agreement 1 covered a portion of the alleged $5 million in damages. (*Id.* at 1-2.) Agreement 2 states that the stipulated judgment against the LLC, for $2,059,125, settles "the portion of the initial Negligence Claims which is in excess of the [$2,940,875.15] Judgment Amount." (*Id.* at 3-4.) Thus, Agreement 2 could be interpreted as a settlement of Interlachen's negligence claims against the LLC, which was the subject of an appeal by Interlachen at the time of settlement.

As an initial matter, the Court determines that if the parties intended Agreement 2 to settle claims **against Kuepers**, then Agreement 2 is unreasonable as a matter of law. The LLC is a legally separate entity from Kuepers. Agreement 1 – between Interlachen and Kuepers – settled all claims against Kuepers other than those related to design, architectural, and/or engineering negligence (which were covered, if at all, by Kuepers's professional-liability insurance policy with an insurer other than State Auto). (McCollum Aff., Ex. 32 at 6.) As part of Agreement 1, Interlachen explicitly agreed it would seek to satisfy the $2,940,875.15 stipulated judgment against Kuepers "solely from Kuepers'

insurers . . . and/or by use of a loan receipt that is subject to a separate agreement between the parties." (*Id*.) Additionally, the state court order approving of Agreement 1 includes entry of judgment against Kuepers only and does not order that Kuepers and the LLC are jointly and severally liable. (McCollum Aff., Ex. 33.) In this context, the Court finds it is impossible to infer that a reasonable insured in the LLC's position would have settled claims **against Kuepers** when the action against Kuepers was already settled and Interlachen agreed, as part of that settlement, to seek collection of the judgment from entities other than the LLC.[22]

The Court next considers the second possible interpretation of Agreement 2 – that it settles Interlachen's negligence claim against the LLC. Interlachen's negligence claim alleged that Kuepers and the LLC "negligently and carelessly construct[ed] the [Development]," and "negligently fail[ed] to properly and competently supervise, direct, monitor, and manage their work and the work of their subcontractors, and to properly coordinate their work with [each other]." (State Court Compl. ¶ 81.) Interlachen further alleged Kuepers and the LLC failed to construct the Development in compliance with applicable building codes, "industry and manufacturers' requirements, free from defects, and in a manner that would make the [t]ownhomes fit for their intended purpose." (*Id.* ¶¶ 83-84.) As for damages caused by the negligence, Interlachen alleged:

---

[22] The Court also notes that Agreement 2 states, in relation to the statement settling claims **against Kuepers**, that it is meant to settle "Kuepers' misrepresentation in connection with repairs undertaken in 2001." (McCollum Aff., Ex. 40 at 3.) This is not a covered claim because Interlachen never asserted a misrepresentation claim based on conduct in 2001. Instead, Interlachen asserted a negligent misrepresentation claim related to repairs Kuepers undertook between 2006 and 2010. (State Court Compl. ¶¶ 61-73.)

> As a direct result of these breaches of duties owed by [Kuepers and the LLC], [Interlachen] ha[d] been damaged . . . for, among other things, the cost to remedy and correct construction defects and bring the [t]ownhomes into compliance with the applicable building codes and industry standards and repair the resulting physical damage, for the diminished value of the [t]ownhomes and the [Development], and for the loss of income resulting from the inability to rent the [Units] while repairs [were] being made.

(*Id.* ¶ 87.)  The negligence claim clearly related to Kuepers's and the LLC's faulty construction falling under the contractual definition of "your work."  Therefore, at least some, if not all, of the $2,059,125 settlement in Agreement 2 is subject to the "Damage To Your Work" exclusion.

This interpretation of Agreement 2 is bolstered by language in the Agreement itself stating that the $2,059,125 settlement is meant to cover "the portion of the initial Negligence Claims which is in excess of the [$2,940,875.15 judgment resulting from Agreement 1]."  (McCollum Aff., Ex. 40 at 3-4.)  Agreement 2 recites that the starting dollar amount for this calculation is the amount "in excess of [$5 million]" that Interlachen initially sought in the state-court action.  And based on the record before the Court, the source of the $5 million figure appears to be Interlachen's professional repairs estimates for $5.4 million and $5.5 million.  (Heyerdahl Aff., Exs. G-J.)  As noted above, these estimates included the costs to remedy Kuepers's faulty workmanship, and therefore at least a portion of the damages based on the estimates is subject to the "Damage To Your Work" exclusion.  The only reasonable conclusion is that at least part, if not all, of the settlement in Agreement 2 represents non-covered damages corresponding to the costs to remedy Kuepers's and the LLC's faulty workmanship.

As with Agreement 1, if the negligence claim against the LLC is not a covered claim in its entirety, "that ends the matter." *Alton M. Johnson Co.*, 463 N.W.2d at 279. And if there is coverage for some portion of the damages corresponding with the settlement amount, Agreement 2 is unenforceable as a matter of law for failure to allocate between covered and non-covered claims. *See Corn Plus*, 516 F.3d at 681.[23] Thus, Agreement 2 is unenforceable against State Auto.

In conclusion, the Court holds that as a matter of law, Agreements 1 and 2 are unenforceable against State Auto, State Auto did not breach a contractual duty to defend or indemnify Kuepers, and State Auto did not breach a contractual duty to indemnify the LLC. The Court will grant State Auto's motion for summary judgment on those claims. Because there is a disputed question of material fact as to whether the LLC acted as Kuepers's real estate manager, and because Interlachen's state-court claims against the LLC "arguably" fell within the CGL Policy, the Court will deny State Auto's motion for summary judgment as to Plaintiffs' claim that State Auto breached a duty to defend the LLC.

This case will be placed on the Court's next available trial calendar.

---

[23] Because the Court finds that Agreement 2 is unenforceable as a matter of law, the Court declines to consider State Auto's additional arguments regarding the existence of coverage and the reasonableness of the settlement amount in Agreement 2.

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant State Auto Insurance Company's Motion for Summary Judgment [Docket No. 62] is **GRANTED in part** and **DENIED in part**, as follows:

1.     State Auto's motion is **DENIED** with respect to the claim that State Auto breached a contractual duty to defend Plaintiff Interlachen Properties, LLC.

2.     State Auto's motion is **GRANTED** in all other respects.  All of Plaintiffs' claims against State Auto, other than the claimed breach of duty to defend the LLC, are **DISMISSED WITH PREJUDICE**.


DATED:  August 4, 2017                      _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                                     Chief Judge
                                                       United States District Court